(C.D. 2077)

THE ASBURY GRAPHITE MILLS, INC., ET AL. v. UNITED STATES

United States Customs Court, Third Division

(Decided April 15, 1959)

*John D. Rode* for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*William J. Vitale* and *Margaret M. Kiley*, trial attorneys), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: The merchandise involved in these cases, consolidated at the trial, consists of plumbago or graphite imported from Ceylon on various dates between December 9, 1954, and August 1, 1956. It is variously described on the invoices as "Ceylon Plumbago 85% thin 'Amorphous Dust,'" "Ceylon amorphous dust graphite," "Ceylon graphite 'Amorphous Dust,'" "Ceylon amorphous chippy dust graphite," and "crystalline bold chips graphite." It was

assessed with duty at 7½ per centum ad valorem under paragraph 213 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as crystalline dust graphite. It is claimed that the merchandise is amorphous graphite, properly dutiable at 5 per centum ad valorem under said paragraph, as modified, or at 2½ per centum ad valorem under said paragraph, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877.

Paragraph 213, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, provides:

Graphite or plumbago, crude or refined:
    Amorphous_____ 5% ad val.
    Crystalline lump, chip, or dust_____ 7½ ad val.

Said paragraph, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, provides:

Graphite or plumbago, crude or refined:
    Amorphous (except artificial)_____ 2½% ad val.

The issue before the court is whether this merchandise is properly classifiable as crystalline or as amorphous graphite or plumbago.

At the trial, the record in *J. F. Starkey & Co.* v. *United States*, 6 Cust. Ct. 118, C.D. 444, was incorporated herein. In that case, it was held that there was a commercial designation of the term "amorphous graphite" different from the common meaning; that Congress, in using the term "amorphous," had in mind the terminology used by the trade; that "amorphous graphite," as that term is regarded in the trade, is that class of graphite which can be readily reduced to powder by ordinary commercial grinding methods, as distinguished from a graphite which cannot be readily converted to powder by such means.

According to the record in that case, crystalline graphite, as understood by the trade, has tenacity and toughness so that under ordinary pressure it will flatten out and become flake, but it does not powder readily. This type of graphite is known as "crucible" graphite because it is suitable for use in the manufacture of crucibles. Amorphous graphite, as understood by the trade, is weak in structure, is readily reduced to powder by ordinary commercial grinding methods, and cannot be used in the manufacture of crucibles.

In the instant case, H. Marvin Riddle, president and owner of The Asbury Graphite Mills, Inc., one of the plaintiffs herein, testified that he has been with the company 45 years and has handled all kinds of graphite from Ceylon, Madagascar, Kenya, Norway, Hong Kong, and Mexico. He said that his firm imports graphite, sells some in crude form, and processes some by mixing and grinding. He de-

scribed the merchandise covered by protest No. 299305–K as amorphous dust, plumbago, and said it was ground particularly for use in making foundry facing, but that some may have gone into paint, brake linings, or pencils. None of it was used for crucibles because it was not satisfactory therefor.

The witness stated that he had testified in the incorporated case; that he was familiar with exhibits 1 to 5 therein, and had examined them the day before. He said that they consisted of amorphous graphite and that they were comparable to the merchandise herein except for the carbon content.

On cross-examination, the witness was shown a letter which he had written to Customs Examiner Zeikel, regarding tests "to determine the commercial designation between crystalline and amorphous graphite" (defendant's exhibit A). The letter states that if the material will not stand a minimum heat of 600 degrees, "it is useless for the type of work that crystalline or flake graphite could be put to." The witness said that the tests described in the letter were used for Madagascar flake only, to determine whether it was usable in crucibles. They were not used in connection with merchandise like that involved herein, which is put into regular production to see how it will grind. The instant merchandise was ground and used principally to produce foundry facing. Some was sold to a paint manufacturer and some to the Joseph Dixon Crucible Co., but the witness was sure it could not be used for making crucibles. The witness explained later that the letter, defendant's exhibit A, was written at the time his firm arranged for the Government to obtain a mill to be used in testing flake graphite.

Robert A. Harris, foreign graphite buyer of the Joseph Dixon Crucible Co., testified that his firm imports graphite from various countries, refines it, and produces various graphite products, such as pencils, crucibles, lubricants, and foundry facings. He said he was familiar with the merchandise covered by protest No. 283015–K; that it was typical of his importations of graphite, and, in his judgment, consisted of amorphous graphite. He said he had been in the business 46 years and had handled amorphous graphite from various countries, as well as other forms of graphite. He stated that he had testified in the incorporated case; that he had looked at the samples therein the day before; that they consisted of amorphous graphite and compared with the merchandise involved herein except for the carbon content.

Louis Gurian, chemist in the United States Customs Laboratory in New York City, testified on behalf of the defendant. He said he had received a sample of graphite identified as that covered by entry No. 712748, protest No. 299305–K. He had placed it in a jar (defendant's

exhibit B) and had made a breakdown test by screening a sample through sieves of different mesh, grinding it in a rod mill for 20 minutes, and sieving it through a 100-mesh sieve. (The test used was that described in defendant's exhibit A.) The witness stated that 46.6 percent of the material (defendant's exhibit C) went through the sieve and 53.4 percent (defendant's exhibit D) remained on the sieve. The former was a powder and the latter consisted of graphite that was metallic in luster, had a crystalline structure, and the individual grains could be recognized or identified on a microscope. He knew that both crystalline and amorphous graphite contained crystals. He identified the sample as crystalline dust graphite (defendant's exhibit E).

The witness stated that the test was performed in the laboratory; that the test he used was a method of distinguishing crystalline and amorphous graphite. In a test to determine whether the sample was readily reducible to powder, he placed a portion between two steel surfaces and applied pressure for 2 or 3 minutes. He found that the material flattened out, just like one mass. He did not know whether graphite would be commercially tested in that way. He did not attempt to make crucibles out of the material.

Mr. Riddle was recalled as a witness and testified that he had examined defendant's exhibits B, C, and D and found that they all consisted of material commercially known as amorphous graphite.

Thus, according to plaintiffs' witnesses, who had had 45 years of experience in the trade, the imported merchandise was comparable to that involved in the *Starkey* case; it consisted of amorphous graphite, as that term is understood by the trade; it was actually ground up and used in making foundry facings and was not used to make crucibles. On the other hand, the Government chemist used a test which, according to the witness Riddle, was meant only for Madagascar flake graphite. The chemist had not used it before. This laboratory test resulted in separating the sample so that part of it was in powder form and part of it in larger pieces. It does not establish whether or not the merchandise was a type of graphite readily reducible to powder by ordinary commercial grinding methods. According to Mr. Riddle, however, the original sample and the separated portions were all amorphous graphite, as that term is commercially understood.

In *J. F. Starkey & Co.* v. *United States*, 15 Cust. Ct. 334, Abstract 50720, plaintiffs' witness testified that he had tested samples by the hammer method of crushing and through visual examination. On the basis of the tests and the examination, he stated that the merchandise was of the class known in the trade as amorphous graphite. He also said that it was the same as the graphite in the first *Starkey*

case, except for its form and carbon content. The examiner and three chemists testified that, according to laboratory tests and their personal opinion, the merchandise was crystalline graphite. The court held, however, that "amorphous graphite," as understood by the trade, consisted of that class of graphite which can be readily reduced to a powder by commercial grinding methods; and that the imported merchandise was the same as that in the first *Starkey* case and was properly classifiable as amorphous graphite.

On the record presented herein, we hold that the merchandise belongs to the class of graphite commercially known as amorphous and that it is properly dutiable as follows: (1) As to the merchandise entered, or withdrawn from warehouse, for consumption prior to September 10, 1955, at 5 per centum ad valorem under paragraph 213 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, and (2) as to the merchandise entered, or withdrawn from warehouse, for consumption on or after September 10, 1955, at 2½ per centum ad valorem under said paragraph, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, and the President's notification of August 22, 1955, T.D. 53877.

The protests are sustained and judgment will be rendered for the plaintiffs.